THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERSHAL JORDAN, Defendant-Appellant.

(No. 54884; ▓▓▓▓▓▓▓▓▓▓

First District—March 27, 1972.

William A. Montgomery, of Chicago, (Alan M. Wiseman, and Schiff, Hardin, Waite, Dorschel & Britton, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Martin Moltz, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, defendant, Hershal Jordan, was found guilty of unlawful sale of narcotic drugs. (Ill. Rev. Stat. 1967, ch. 38, par. 22—3.) He was sentenced to the penitentiary for a term of 12 to 18 years. Pursuant to his appeal to this court, a brief was filed in his behalf by the Public Defender of Cook County. Thereafter the Public Defender withdrew and a supplemental brief and an addendum thereto were filed by his present counsel. The original brief is directed to the weight of the evidence and urges the contention that the proof was not sufficient. The additional briefs are directed to an alleged violation of constitutional rights of defendant by failure of the State to produce evidence which might have been favorable to his defense. A summary of the pertinent facts is required.

The case was tried in October of 1969, approximately one and one-half years after the arrest. One of the arresting officers testified that on the evening of May 6, 1968, he met an Informer in the area of 43rd Street and Indiana Avenue, in Chicago. He then took the Informer to police headquarters. On cross-examination, the witness conceded that his official report, filed shortly after the arrest, showed that he met the Informer at police headquarters.

The officer further testified that the Informer was thoroughly searched and was given $13 in so-called "prerecorded" currency. In this process, the serial numbers of the bills were written on an inventory slip. The witness and another police officer, together with two police trainees and the Informer, all drove in an unmarked police automobile to 44th Street and Calumet Avenue in Chicago. At this time, the witness and the

Informer alighted from the automobile. The remaining police personnel drove the automobile west on 44th Street to a point under the elevated tracks, which run in a north and south direction parallel to and slightly west of Calumet Avenue.

The officer also testified that the Informer walked north on Calumet Avenue to 43rd Street and then west on the south side of the street to the elevated station. The officer followed the Informer by walking on the opposite or east side of Calumet Avenue and then turning west on the north side of 43rd Street to a point under the elevated tracks. There he saw defendant and Informer, directly across 43rd Street, engage in five or ten minutes of conversation. They then walked east to the southwest corner of Calumet Avenue and 43rd Street. As they approached the corner, he saw the Informer hand something to defendant. The officer also testified on cross-examination that the hands of the defendant and the Informer met but that he did not see any object pass between them. At the preliminary hearing of the case, held on July 23, 1968, the police officer testified that he did actually see the Informer hand something to defendant. The Informer testified on trial that he gave the $13 in prerecorded funds to defendant at this point and also that he exaggerated his movements so that this could be observed by the police officer.

The officer further testified that defendant then motioned to a lady, later identified as Kim Scott, who approached from a position near the corner. The Informant walked several steps away and this person and defendant engaged in conversation. The witness continued to watch and the Informer and the lady then walked together around the corner of Calumet Avenue and in a southerly direction to a doorway. There is a large apartment building on the southwest corner of 43rd Street and Calumet Avenue which has entrances on Calumet Avenue. The officer then saw the lady, Kim Scott, reach under her dress and remove something which she gave to the Informer. The Informer then gave the officer a prearranged signal that the sale had been completed. He did this by removing his hat and wiping his head. The Informer and Kim Scott walked back north on Calumet Avenue to the corner of 43rd Street. There they joined the defendant and all three of them walked west on 43rd Street to the elevated station.

After a brief conversation, the Informer left the other two persons and walked south in the alley under the elevated tracks toward the waiting police car. The defendant and Kim Scott entered a building near the corner of 42nd Street and Calumet Avenue. Two or three minutes later, the woman came out of this building and walked back south on Calumet on the west side of the street towards 43rd Street. The witness arrested her. Shortly thereafter, the police officer saw defendant walking south

on the west side of Calumet towards 43rd Street. Defendant turned west on 43rd Street and walked toward the elevated tracks where he was arrested.

The Informer testified that he was, at the time of this transaction, a full-fledged narcotic addict. He had used narcotics on the night in question, some four or five hours before, so that he was then under the influence of a narcotic drug. He had abstained from narcotics for some 12 or 13 months prior to his testimony. On cross-examination, he admitted that he was sentenced to the Illinois penitentiary in 1963 after conviction of theft from the person. He testified that he met the arresting officer at 43rd Street and Indiana Avenue, in Chicago, and that they went to police headquarters together. There, he was completely searched and was given $13 in prerecorded funds. He was driven to 44th Street and Calumet Avenue in a car, together with the two police officers and two trainees.

The car stopped at the corner of 44th Street and Calumet Avenue and he got out and walked north on the west side of Calumet Avenue. At 43rd Street he walked west on the south side of Calumet Avenue. He met defendant under the elevated tracks at the station and told defendant that he had $13 and wanted to buy some narcotics. He and the defendant then walked east together on the south side of 43rd Street. At the corner of 43rd Street and Calumet Avenue, the Informer gave defendant the $13. He and defendant were then joined by Kim Scott, who was described by the Informer. Defendant told the lady to give the Informer "one bag."

The lady and the Informant left defendant and walked together to the building vestibule facing on Calumet Avenue slightly south of 43rd Street. The lady put her hand beneath her dress and gave the Informer a tinfoil packet. He took his hat off and wiped his brow with his handkerchief. He and the lady then left the vestibule and walked back to the corner. They met defendant and all three of them walked together in a westerly direction to the elevated station. The Informer left them and walked south through the area under the elevated tracks to the waiting automobile. The Informer gave the tinfoil packet to the police officer in the automobile who gave him a dollar and told him to go back to police headquarters, which he did. The parties stipulated that the tinfoil packet contained heroin.

The police officer who had waited with the automobile testified that he was present at police headquarters when the Informer was originally searched. The search revealed that Informer then had no contraband or money on his person. The officers then recorded the numbers of $13 in currency provided from the Police Department's contingency fund

and gave the money to the Informer. The Informer, the two officers and two police trainees then drove to the corner of 44th Street and Calumet Avenue. The Informer and one arresting officer left the automobile and the witness drove west on 44th Street to the alley underneath the elevated tracks where they waited. After a time, the Informer came to the car and gave the witness a tinfoil packet which contained a white powder. A field test gave a positive result as regards presence of narcotics. The two officers then communicated by radio as a result of which the car proceeded to 43rd Street and Calumet Avenue. The arresting officer at that time had a lady in custody. The car circled about searching for defendant who had been described by the Informer and by the arresting officer. Upon further radio communication, the police car proceeded to 43rd Street near the elevated station where defendant was placed in the car.

Two additional factors must be noted here. The arresting officer who first testified told the court and jury on direct examination that he knew the Informer under two names; namely, Walter Hampton and Peter Potts. On cross-examination, he testified that these were the only two names under which he knew this individual and that he did not know him by any other name. At the preliminary hearing held July 23, 1968, less than three months after the arrest, he testified that the name of the Infomer was Gus Water. In the case at bar, he testified further that he did not remember this previous testimony.

This officer further testified in the case at bar that the prerecorded money originally given to the Informer was never found. He also testified that the lady in question and defendant were both searched when arrested and that the searches were negative as regards the prerecorded funds and narcotics of any kind. The arrest report indicated that the prerecorded funds were not recovered and that no narcotics were found on the person of defendant or the lady. In testimony at the preliminary hearing, the officer testified that all of the prerecorded funds were found. Counsel for defendant verified this prior testimony of the officer by calling the court reporter who had attended the proceeding.

The defendant testified in his own behalf. On direct examination, he stated simply that he did not sell heroin to the Informer on the date in question or at any time prior thereto. On cross-examination, he testified that he knew Kim Scott and that he had been with her on May 6, 1968, for part of the night at or about 10:00 P.M. He further testified that he walked with her in the area of the elevated structure near 43rd Street and Calumet. He was arrested under the elevated structure on the south side of 43rd Street after he had left Kim Scott. He had been with her some four or five minutes after he had left a pool-room in the vicinity.

He denied that he knew the Informer and denied that he had ever seen him before the appearance in court.

■■ In considering the first contention of defendant regarding sufficiency of the proof, we must commence from the premise that the testimony of a narcotics addict is to be viewed with great caution. From his addiction to narcotics, it follows necessarily that his credibility must be subject to most careful scrutiny. The decisions setting forth this principle are cited in *People v. Dade*, 109 Ill.App.2d 337, 341, 248 N.E.2d 844. We will apply this rule even though the testimony of the Informer was itself completely credible and he was not impeached in any manner. The issue in cases of this type is whether, upon the entire record, the testimony of the addict is believable. *People v. Norman*, 28 Ill.2d 77, 82, 190 N.E.2d 819; *People v. Ramirez*, 124 Ill.App.2d 407, 413, 260 N.E.2d 435.

In one crucially important respect, the testimony of the Informer receives strong corroboration. It is certain that he had no narcotics in his possession when he left the police automobile in the area. It is equally certain that when he returned to the automobile he did have a packet of heroin which he surrendered to the police. During all of this time, he was under the surveillance of the first arresting officer. He could only have obtained the drug a few moments before in the immediate area of Calumet Avenue, 43rd Street and the elevated tracks. The only possible source reasonably shown by this record was his contact with the defendant and Kim Scott. In this regard, the admission of the defendant that he was in that precise area at or about the time in question also serves to confirm the testimony of the Informer. On the other hand, the bare denial of defendant that he sold heroin to the Informer is completely unsupported and unconvincing. There is a strong interlocking corroboration between the testimony of the Informer and that of the police officer to whom he made delivery of the heorin.

■■ As we have pointed out, the testimony of the first arresting officer who watched the Informer is attacked by defendant. There are discrepancies between the testimony of this officer on the trial and the testimony which he gave in July of 1968 at the preliminary hearing, some 15 months before. Whether these admitted variations are to be classified as being sufficiently important to seriously affect the credibility of the police officer, or whether they are inconsistencies which naturally resulted from lapse of time, was a matter for determination by the trier of fact.

Defendant argues strongly that the prerecorded money given to the Informer was never recovered and that it was not found on the person of the defendant when he was arrested. This argument disregards the fact

that when defendant left the immediate area he was accompanied by Kim Scott and they went into a building together. This gave him ample opportunity to dispose of the proceeds of sale. In addition, it overlooks the fact that under the law in force at that time, sale of narcotics included a gift and also included completion of the transaction by defendant or by his agent or servant. (Ill. Rev. Stat. 1967, ch. 38, par. 22—2—11. See *People v. Shannon*, 15 Ill.2d 494, 496, 155 N.E.2d 578. See also *People v. Robinson*, 14 Ill.2d 325, 332, 153 N.E.2d 65 cited in *People v. Brown*, 116 Ill.App.2d 228, 232, 253 N.E.2d 478.) Thus, whether or not money was actually passed in this transaction is not legally a material fact. The important ultimate fact is the transfer of possession of the packet of heroin which the record here proves beyond reasonable doubt. That is the distinction between the case at bar and cases such as *People v. Dade*, 109 Ill.App.2d 337, 248 N.E.2d 844, where there was no evidence except that of the informer regarding the source of the heroin and the police did not observe transfer of the drug to defendant.

■■■ Upon review of all the evidence, and after deep and detailed consideration, we have concluded that the verdict of guilty should not be disturbed. It is an "axiomatic" principle of appellate review that "*  *  * it is the function of the trier of the facts to determine the credibility of the witnesses, and its finding of guilty will be disturbed only when the evidence is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt." (*People v. Glover*, 49 Ill.2d 78, 84, 273 N.E.2d 367.) The jury saw and heard all of the witnesses and all of the alleged discrepancies in the testimony were fully explored by able counsel in argument. The jury was properly instructed as to previous inconsistent statements in the testimony and other elements affecting credibility. Under these circumstances, we find that the evidence was sufficient to convict beyond a reasonable doubt.

In a supplemental brief and addendum thereto, defendant attempts to raise a constitutional issue predicated upon failure of the State to produce documentary evidence concerning the prerecorded funds. In October of 1968, one year before trial, defendant filed a written motion for discovery. This motion included ten various items which defendant wished produced. We cannot interpret any of these items as applying to or definitely describing an inventory slip of prerecorded funds. The record shows here that both police officers testified that a slip was prepared and signed at police headquarters containing a list of the currency given to the Informer. When this testimony was introduced, counsel for defendant asked for production of police reports, inventory slips and reports of prerecorded funds.

In response to this request, out of the presence of the jury, the State's Attorney gave counsel for defendant a two page police report, a copy of a police inventory sheet, a copy of the laboratory report pertaining to the heroin and a copy of the arrest report. The State's Attorney advised the court that he did not have a copy of the inventory slip with regard to the prerecorded funds. The State's Attorney then checked with the police officer and was told that the State did not have such inventory slips in its possession. With the permission of the court, the State's Attorney interrogated the police officer out of the presence of the jury. The officer testified that there had been such an inventory slip in existence; that there were two copies of it in the file showing the prerecorded money; that the file had been misplaced; that the inventory slips were not in the file when it was located and that the officer did not know where they were. Counsel for defendant said nothing further at this point. In closing argument on the weight of the evidence, he commented on the absence of the inventory slips. Under these circumstances, we do not reach the constitutional issue raised by present counsel for defendant with reference to production of the inventory slips.

■■ In our opinion, the rights of defendant were not prejudiced in any manner by failure of the State to produce this evidence. There is no showing or indication that the evidence would be in any manner beneficial to defendant. The testimony tends strongly to the contrary. The evidence also bears upon a fact which has no legal materiality, the passage of currency from the Informer to defendant or his agent. That is why this case differs from *Brady v. Maryland,* 373 U.S. 83, where the evidence consisted of extra judicial statements made by a codefendant, which the court characterized as material, and *United States v. Bryant,* 439 F.2d 642, where the tape recordings may have contained direct and material evidence on the issue of guilt or innocence.

In the addendum to their supplemental brief, defendant's present counsel cite *People v. Howze,* 1 Ill.App.3d 253, 273 N.E.2d 733. In that case, the defense requested a copy of a police report. The prosecution stated that they were unable to find the report. The Appellate Court pointed out that the contents of the report may have been of substantial assistance to the defense in cross-examination. Accordingly, the court directed that the cause be remanded for the limited purpose of determining if the report in question was in existence and could be produced. In the case at bar, such hearing has already been held with a negative result and the absence of the slip was considered by the trier of fact.

The judgment appealed from is therefore affirmed.

Judgment affirmed.

BURKE and LYONS, JJ., concur.