810

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM C. WERHOLLICK, Defendant-Appellant.

(No. 57224;

First District (1st Division)—August 19, 1974.

Arthur L. Belkind and Edward M. Genson, both of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Dennis J. O'Hara, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The defendant was found guilty by a jury of armed robbery and not guilty of attempt murder and was sentenced to not less than 3 nor more than 10 years in the Illinois State Penitentiary.

On this appeal, three issues are raised: (1) Whether the trial court erred when it denied the defendant's motion to suppress the in-court identification testimony; (2) Whether the defendant was proven guilty of armed robbery beyond a reasonable doubt; and (3) Whether comments by the prosecutor during the trial and in closing argument were so prejudicial to the defendant as to require reversal or a new trial.

Defendant seeks an outright reversal or, in the alternative, a new trial. For reasons which follow, we affirm the judgment.

Donald Lingo, the principal witness for the State and victim of the crime, testified that he spent most of the day on July 26, 1970, racing his motorcycle at the "U.S. 30 Drag Strip" in nearby Indiana. Afterwards, he and his business partner went to a carnival. Around 9 P.M., they drove to a tavern in Roseland called "The Playpen Lounge." They

had been drinking at the carnival and continued to do so at the tavern. Lingo's partner stayed only a short time, but Lingo stayed on until approximately 10:30 P.M. He then left the bar and proceeded toward his car. There he was approached by one of two men standing nearby. As he opened the car door, the man shoved a pistol in his face and demanded that he turn over his money.

Lingo stated that he first tried to reason with the man but the man was not in a listening mood. The man searched him and took $600 out of his left front pocket. The man ordered Lingo to turn around. Lingo suddenly broke toward the entrance to the bar and while running he was shot in the arm. He stumbled on into the tavern. Police were summoned. The confrontation lasted approximately 5 minutes during which time Lingo stated that he was able to clearly observe the robber who was standing only a foot or so away.

Lingo changed part of his story during cross-examination. He admitted having been at the tavern in the afternoon and having several drinks there. This was contrary to his story about having been at the drag strip during the afternoon.

Shortly after the robbery, Officers Schewe and Stalnaker interviewed Lingo for about 1 hour at Roseland Community Hospital. Both officers testified that he responded to all their questions and that to them he appeared to be sober.

The following day Lingo went to police headquarters. He was shown numerous photographs by Officer Schewe. Lingo picked one and identified it as a photograph of the man who had robbed and shot him. That man was the defendant.

Defendant was taken into custody on the afternoon of August 11, 1970, around 5:30 P.M. on the roof of a building by Officer Schewe. Apparently there was no arrest warrant—at least there is no evidence of one appearing in the record. Schewe then contacted Lingo and asked him to come down to the station for the purpose of viewing a lineup. The lineup was conducted around 11 P.M. Lingo identified the defendant out of four white males as the man who robbed and shot him.

Defendant testified at the hearing on his motion to suppress that he was never advised of any right to have an attorney present at the lineup. He stated that he had asked to have an attorney present but that his request was refused. His motion to suppress the in-court identification testimony stemming from the lineup was denied.

At the trial, in addition to the above testimony, the victim Lingo testified on cross-examination by the defense that after the incident he had a conversation with the defendant's brother-in-law Fields in an-

other tavern, but denied that he offered to drop the prosecution for $1000 and testified that, on the contrary Fields offered him $1000 to do so.

The following witnesses testified for the defense at the trial. A lady bartender at the tavern testified that Lingo came in with a friend around 2:45 in the afternoon and remained there for approximately 1½ hours during which time he had five or six drinks. She further testified that the defendant and his brother-in-law were in the bar around 4:30 P.M. She stated that Lingo returned alone around 8:30 P.M. and drank until 9:30 P.M. A woman then joined him. During the time he was in the tavern that night, the bartender said that Lingo had five or seven more drinks. She added that in her opinion he was "getting drunk" when he finally left. He returned 2 minutes later, saying that he had been shot and she saw blood on his arm.

Another witness for the defense testified that he was in his automobile about 10 feet from the scene of the crime. He saw two men holding a third man against a fence. He stated that he knew the defendant and that defendant was not one of the three men because there was a difference in their builds. However, in rebuttal the State called Officer Schewe who testified that the same witness told him on the evening of the crime that he was unable to see any of the faces of the three men and therefore was unable to give an accurate description of them.

Defendant's brother-in-law also testified for the defense that he was approached by Lingo in September of 1970, and that Lingo offered to drop the charges against the defendant if the defendant would pay him $1000.

The jury returned a verdict of guilty of armed robbery but not guilty of attempt murder. Following a hearing in aggravation and mitigation, the trial judge sentenced the defendant to a term of not less than 3 nor more than 10 years in the Illinois State Penitentiary. This appeal followed.

The defendant's first contention is that the trial court erred in denying his motion to suppress in-court identification testimony. He maintains that such testimony should have been suppressed because it was based on a constitutionally deficient pre-indictment lineup in that he was denied representation by counsel in violation of his Sixth Amendment right.

■■■ According to Mr. Justice Stewart speaking for the majority in *Kirby v. Illinois* (1972), 406 U.S. 682, 683-684, 32 L.Ed. 2d 411, 92 S.Ct. 1877, the Supreme Court held in *United States v. Wade* (1967), 388 U.S. 218, 18 L.Ed. 2d 1149, 87 S.Ct. 1926, and in *Gilbert v. California* (1967), 388 U.S. 263, 18 L.Ed. 2d 1178, 87 S.Ct. 1951:

"* * * 'that a post-indictment pretrial lineup at which the ac-

cused is exhibited to identifying witnesses is a critical stage of the criminal prosecution; that police conduct of such a lineup without notice to and in the absence of his counsel denies the accused his Sixth [and Fourteenth] Amendment right to counsel and calls in question the admissibility at trial of the in-court identifications of the accused by witnesses who attended the lineup' *Gilbert v. California,* supra, at 272. Those cases further held that no 'in-court identifications' are admissible in evidence if their 'source' is a lineup conducted in violation of this constitutional standard. 'Only a per se exclusionary rule as to such testimony can be an effective sanction,' the Court said, 'to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup.' Id at 273."

■■ However, the court in *Kirby* declined to extend the rationale of *Wade* and *Gilbert* to situations like this one involving pre-indictment pretrial lineups because it did not believe that an individual's right to counsel attached until the State had taken some act by which it had committed itself to what the court called "adverse judicial proceedings" (*Kirby* at 688) against the accused. As the court put it at pages 689-690:

"The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable. See *Powell v. Alabama,* 287 U.S., at 66-71; *Massiah v. United States,* 377 U.S. 201; *Spano v. New York,* 360 U.S. 315, 324 (Douglas, J., concurring)."

■■ The point marking the initiation of adverse judicial proceedings was discussed by the Second Circuit in *U.S. ex rel. Robinson v. Zelker* (1972), 468 F.2d 159, *cert. denied,* 411 U.S. 939, where the court held that once an arrest warrant has been issued against a defendant based upon "information upon oath" that he has committed a crime then adverse judicial proceedings against him have been initiated sufficiently to entitle him to be represented by counsel at any identification.

The Illinois Supreme Court subsequently adopted the view expressed in *Kirby,* and held that its prior holding in *People v. Palmer* (1969), 41

Ill.2d 571, 244 N.E.2d 173, where it had followed the *Wade* and *Gilbert* rule "be modified and broadened to apply the *Wade* and *Gilbert* rule to not only post-indictment lineups but to lineups conducted after the initiation of adversary judicial criminal proceedings against an accused by whatever means." *People v. Burbank* (1972), 53 Ill.2d 261, 272, 291 N.E. 2d 161, *cert. denied*, 412 U.S. 951.

In the present case the defendant was taken into custody by police as the result of the victim's identification of the defendant as his assailant from some photographs shown him by the police. The record does not indicate that an arrest warrant had been issued. The lineup occurred approximately 6 hours after defendant was taken into custody but before any charges were filed against him. Defendant now urges us to conclude that the police investigation had sufficiently narrowed down to him such that as a matter of law adverse judicial proceedings had been initiated against him and he therefore should have been represented by counsel at the lineup. To so rule, however, would be to ignore the law. Here there was no arrest warrant, formal charge, preliminary hearing, indictment, information, or arraignment preceding the lineup. Therefore, no adverse judicial proceedings had as yet been initiated against the defendant and he was not entitled to representation by counsel.

*Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L.Ed. 2d 977, 84 S.Ct. 1758, is not applicable to this case since *Escobedo*, as was *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602, was primarily concerned with guaranteeing "full effectuation of the privilege against self-incrimination" during interrogation. *Johnson v. New Jersey* (1966), 384 U.S. 719, 729, 16 L.Ed. 2d 882, 86 S.Ct. 1772.

■■ Therefore, it follows that the motion to suppress was properly denied by the trial court.

Defendant's second contention is that his conviction should be reversed because he was not proven guilty of armed robbery beyond a reasonable doubt. In support of this he makes two arguments. First, he maintains that testimony by Lingo, the State's principal witness and victim of the crime, was glaringly inconsistent as evidenced by the confusion regarding his whereabouts on the afternoon of the crime and the confusion regarding his companions at the bar. However, as the State points out, despite these inconsistencies, his testimony was positive as to the identification of the defendant as the assailant. One of the fundamental legal principles governing appeals is that this court will not substitute its findings for the findings of the trier of fact unless those findings are palpably erroneous. (*People v. Hyman* (1972), 8 Ill.App.3d 382, 385, 290 N.E.2d 627.) As was said in *People v. Morgan* (1963), 28 Ill.2d 55, 62, 190 N.E.

2d 755, "* * * these alleged discrepancies were fully brought out before the jury, whose function it was to determine the credibility of the witness." Further, "[p]ositive identification by one witness, who has ample opportunity for observation, may be sufficient to support a conviction." (*People v. Mack* (1962), 25 Ill.2d 416, 421, 185 N.E.2d 154.) In this case the jury had ample opportunity to consider all the testimony including the contradictions and the alleged attempted bribe by the complaining witness. The jury chose to believe Donald Lingo's testimony positively identifying the defendant as the attacker. Since there is evidence in the record supporting that conclusion, we decline to substitute the defendant's suggested conclusion.

■■ Second, the defendant argues that he was not proven guilty beyond a reasonable doubt because the jury's verdict finding him guilty of armed robbery but innocent of attempt murder was legally inconsistent. We need only point out that verdicts do not need to be logically consistent to be legally valid. In *People v. Hyman* (1972), 8 Ill.App.3d 382, 290 N.E.2d 627, the jury found the defendant guilty of armed robbery and innocent of aggravated battery even though the charges arose out of the same circumstances. On appeal this court held that such a verdict while logically inconsistent, nevertheless, can be legally consistent since the verdict might well reflect the jury's desire for leniency. Therefore, even though the verdicts in the present case might appear to be inconsistent, that alone is not enough for us to conclude that they are legally inconsistent. Consequently, there is no merit to defendant's contention that he was not proven guilty beyond a reasonable doubt.

■■ Defendant's third and final contention is that his conviction should be reversed because of the prosecutor's comments during the trial and closing argument. The first instance cited occurred during the following colloquy between the prosecutor and Officer Schewe in reference to how the police located the defendant:

"PROSECUTOR: Did you at any time have any address for the defendant?

WITNESS: We had an address in the police records, of his parents.

DEFENSE COUNSEL: Objection, judge * * * move for mistrial."

Defendant maintains that the prosecutor impermissibly referred to his prior criminal record and thereby prejudiced the defendant in the eyes of the jury. We do not agree since there was no reference to the defendant's prior criminal record—only a reference that police had his parent's address which could mean any of a number of different things.

■■ The second alleged instance of indiscretion occurred during the

prosecutor's closing argument when he commented that "the testimony of Mr. Lingo about the robbery-shooting is uncontradicted." Defendant argues that by this comment the prosecutor was impermissibly referring to the defendant's failure to testify on his own behalf. We find this argument to be without merit since the prosecutor at that point was merely summarizing evidence and not attempting to point the finger of blame at the defendant for failing to take the stand when it was in his power to enlighten the jury. (*People v. Mills* (1968), 40 Ill.2d 4, 8, 237 N.E.2d 697.) Furthermore the court promptly sustained an objection to the remark.

We therefore affirm the judgment.

Judgment affirmed.

EGAN, P. J., and BURKE, J., concur.